Preston O. BARKER, Jr., Individually and as next friend of David Keith Barker, Appellants,

v.

BATEMAN FOUNDRY & MACHINE COMPANY, INC., Appellee.

No. 5180.

Court of Civil Appeals of Texas, Eastland.

March 1, 1979.

Rehearing Denied March 29, 1979.

Kenneth C. Kaye, League City, David Cleveland, Creighton & Cleveland, Mineral Wells, for appellants.

S. G. Johndroe, Jr. and William B. David, Fort Worth, Duncan Gault, Mineral Wells, for appellee.

DICKENSON, Justice.

The question presented is whether the jury answered enough of the special issues to support the judgment which was entered on the verdict. Plaintiffs, Preston O. Barker, Jr., and his minor son, David Keith Barker, sued defendant, Bateman Foundry & Machine Company, Inc., for the boy's personal injuries. Plaintiffs alleged that Bateman Foundry manufactured an ice crushing machine which injured the three-year old boy by crushing his right hand, forearm and elbow, resulting in their surgical amputation. Plaintiffs alleged negligence, breach of implied warranty and strict liability. Bateman Foundry denied any liability and pleaded that its product, an ice crusher, was not unreasonably dangerous when used properly and in the manner in which it was intended to be used. Bateman Foundry also denied that the machine was in the same condition at the time of this accident on September 13, 1972, as it was when it was originally manufactured and sold, sometime between 1946 and 1952. The jury returned a partial verdict which is summarized as follows:

### SPECIAL ISSUE NO. 1

The ice grinder was *not* defectively designed or manufactured.

### SPECIAL ISSUE NO. 2

No answer was required in view of the negative answer to 1.

### SPECIAL ISSUE NO. 3

The failure of Bateman Foundry to provide the ice grinder with a slip clutch or similar device was *not* negligence.

### SPECIAL ISSUE NO. 4

No answer was required in view of the negative answer to 3.

### SPECIAL ISSUE NO. 5

The jury *failed to answer* the question: "Do you find from a preponderance of the evidence that the failure of Bateman Foundry & Machine Company, Inc. to provide the ice grinder with an 'on-off' switch was negligence?"

### SPECIAL ISSUE NO. 6

The jury *failed to answer* the question: "Do you find from a preponderance of the evidence that such failure was a proximate cause of the occurrence in question?"

### SPECIAL ISSUE NO. 7

The failure of Bateman Foundry to provide the ice grinder with a one-way door, flap or screen was *not* negligence.

### SPECIAL ISSUE NO. 8

No answer was required in view of the negative answer to 7.

### SPECIAL ISSUE NO. 9

The jury answered "none" for past medical, hospital care and prosthetic devices.

### SPECIAL ISSUE NO. 10

The jury answered "none" for future prosthetic devices.

### SPECIAL ISSUE NO. 11

The jury *failed to answer* the damage issue concerning past and future physical pain and mental anguish and for loss of future earning capacity and disfigurement.

Plaintiffs moved for a mistrial. Bateman Foundry moved for judgment on the verdict. The trial court rendered judgment that plaintiffs recover nothing. Plaintiffs' amended motion for new trial asserts among other grounds that the court erred in accepting a defective and incomplete verdict from the jury and in permitting Bateman Foundry to prove that the medical, hospital and prosthetic expenses had been furnished by the State of Texas at no cost to plaintiffs. Plaintiffs appeal from the Order overruling their Amended Motion for New Trial. The judgment will be reversed, and the cause will be remanded.

■ Plaintiffs' first two points of error were that the trial court erred in (1) accepting a defective and incomplete verdict from the jury and in (2) basing its judgment upon a defective and incomplete verdict. We agree that the trial court erred in accepting an incomplete verdict and entering judgment thereon.

Tex.R.Civ.P. 279 provides in part that: "When the court submits a case upon special issues, he shall submit the controlling issues made by the written pleadings and the evidence . . . ."

Tex.R.Civ.P. 290 provides in part that: "A verdict is a written declaration by a jury of its decision, comprehending the whole or *all the issues* submitted to the jury . . ." (emphasis added)

Tex.R.Civ.P. 301 provides in part that: "The judgment of the court shall conform to the pleadings, the nature of the case proved and the verdict . . . ."

3 McDonald, Texas Civil Practice (1970) § 15.03.01 states that:

When a cause has been submitted on special issues, every material issue must be answered by the jury and the court cannot, under any circumstances, supply findings upon unanswered or incompletely answered material issues. When it develops that a tendered verdict contains material issues which have not been answered responsively, the court should decline to accept it and should, with proper written instructions pointing out the de-

fect, retire the jury for further deliberations. If, after such deliberations, the jurors still are unable to answer one or more material issues, a mistrial results.
. . .

See also, *Allied Finance Company v. Gammill*, 440 S.W.2d 897 (Tex.Civ.App.—Fort Worth 1969, writ ref'd n. r. e.).

*Blanton v. E. & L. Transport Co.*, 146 Tex. 377, 207 S.W.2d 368 (1948), states the rule as follows:

If a fair trial requires the submission of all issues raised by the testimony although a finding on some may negative a favorable finding on others, it necessarily follows that a finding on some of the submitted issues does not defeat a litigant's right to have other submitted issues answered, merely because such answers may be conflicting. Otherwise, the verdict would not comprehend, "the whole or all the issues submitted," as required by Rule 290, Texas Rules of Civil Procedure.

Special Issues 5, 6 and 11 are material, and the evidence requires that they be submitted to the jury. *Burke Wiley, Inc. v. Lenderman*, 545 S.W.2d 226 (Tex.Civ.App.—Houston (1st Dist.) 1976, writ ref'd n. r. e.).

H. A. Lehman, President of Bateman Foundry, testified in part as follows:

Q Did Bateman manufacture that machine (the one involved in the incident)?

A It did.

Q . . . the reason that Bateman did not furnish on-off switches on its machines, even today, is because the electrical codes, of say Mineral Wells, are different from the electrical codes, of say New York City?

A That is correct.

Q How is it, sir, that the people who make these edgers get away with furnishing electrical cords and on-off switches for both New York City and Mineral Wells?

A I wouldn't know that.

Q All right. When you operated these ice crushers at your convention, sir.

A Yes.

Q You had to put on an electrical cord?

A That's correct.

Q And an on-off switch?

A That is correct.

Q Why did you put on an on-off switch?

A So we would have control of the ice crusher.

Q All right, sir. Why didn't you just plug it in and unplug it?

A That's a no-no.

Q Was it a no-no back in 1946 to 1952?

A As far as my knowledge on equipment, that would be unpractical.

Q Well, you did it when you took it to the conventions. It wasn't unpractical while you were trying to sell everybody this machine.

A Because we were operating it ourselves.

Q You were cautious about the safety of your employees then?

A That's correct.

Q That's a fair statement.

A Right.

Q But the caution did not extend to people who might buy the machine?

A (No answer.)

MR. DAVID: Answer it, go ahead.

A I'm trying to think. Certainly the caution went to the people that's going to buy that because we didn't put it on for them in the first place.

The ice crusher machine was introduced into evidence and an ice crushing procedure was demonstrated to the jury.

■ The eyewitness, Mike Barksdale, testified in part as follows:

Q . . . go ahead and tell me what you recall about how this accident happened.

A Okay. We had loaded, I guess—I don't know. We probably had two hundred pounds of ice already loaded; had the last tub to load, I think, and I was crushing. And some man—I don't know his name—he came in and wanted some fish. And the ice was crushing, you know, while he came up. Well, Mrs. Barker, she went inside the fish house with him and said, "I'll be back in just a second." Well, I waited for it to quit crushing, and when it did, I grabbed the tub and turned around. I had seen the children inside the fish house, but they usually kept a tight rein on them and kept them away from out front when they were crushing ice. I watched them anyway, because having one of my own, naturally, I just watch closer. I couldn't have been turned around three seconds until I heard the baby scream. And when I turned around, it had him pulled up plumb to his shoulder in that ice machine. I'm not sure how he got—I mean, I can guess how he got into it, but, anyway, it got him from the underneath side is how he was hooked in the ice crusher, because it had him pinned against the bottom of the crusher. His shoulder was up in it. And when I heard him screaming, I reached around and pulled the wire out of the wall. And when I did this, the baby fell down, and I just reached and picked him up and headed for my truck. Well, the man that was there—I don't recall who he is—but, anyway, he wanted to drive. And he thought the baby was mine, and at the time I didn't even know whose baby it was. But we put him in the truck and headed for the hospital with him. And we got to the hospital and started trying to get some help for him.

Q Now, when you came there at first, Mrs. Barker (the injured boy's grandmother) was crushing the ice, and you were taking it out to your pickup?

A Right.

Q . . . somebody came up during the process of the crushing of the ice.

. . .

A The man wanted some shrimp . ., and she (the boy's grandmother) stepped inside to show him the shrimp while my ice was finishing crushing. And then my ice finished, I picked it up and turned around and loaded it, and that's when I heard him scream.

Q . . . When you would pull your tub out, you would wait until all the ice had crushed?

A Yes, sir.

Q So there wasn't any ice falling down on the ground or coming through there or anything?

A No, sir. The ice had already quit grinding.

Q . . . When you reached up and you say you pulled the wire, you yanked it out of the wall?

A Right.

Q And that stopped the machine, of course.

A Yes, sir.

Q And did that just appear to release his arm?

A It seemed like it threw him out of it instead of just dropping him. . .

Q Now, you said that the ice that was in the machine had finished crushing and you picked up the tub and all?

A Yes.

Q And, of course, the motor kept running. Was there any more ice to be crushed? Is that the reason it was left running, or did you leave that to Mrs. Barker to turn off, or who would have unplugged it?

A I would have unplugged it, but you had to step up on this ramp to unplug it without just yanking it out of the wall . . . .

It was undisputed that Bateman Foundry manufactured the ice crushing machine and that Bateman Foundry sold its machines without any "on-off" switches. There is some evidence from which a jury could conclude that this was negligence which was a proximate cause of the occurrence. A trial court cannot refuse to submit an issue, and to secure findings on such issue, even if the evidence might be insufficient to support a judgment based upon such issue. *Burke Wiley, Inc. v. Lenderman, supra.* There is also evidence that plaintiffs suffered damage because of pain, suffering, loss of earning capacity and disfigurement.

The other points of error are not reached in view of our ruling on the first two points of error.

The judgment is reversed, and the cause is remanded.

RALEIGH BROWN, Justice, dissenting.

I dissent because there is no evidence to support a finding of proximate cause in response to Special Issue No. 6. Without such evidence, Special Issue No. 5 becomes immaterial and the jury's failure to answer same is of no consequence.

The court in *Texas & Pacific Railway Company v. McCleery*, 418 S.W.2d 494 (Tex. 1967) said:

The well established law of this State is that proximate cause includes two essential elements: (1) foreseeability, and (2) cause in fact or causal relation. *Baumler v. Hazelwood*, 162 Tex. 361, 347 S.W.2d 560 (1961); *Hopson v. Gulf Oil Corp.*, 150 Tex. 1, 237 S.W.2d 352 (1951). . . .

In *Missouri Pacific Railroad Company v. American Statesman*, 552 S.W.2d 99 (Tex. 1977), the court said:

Cause in fact as an element of proximate cause means that the negligent act or omission was a substantial factor in bringing about the injury and without which no harm would have been incurred.

. . .

In the instant case, an on or off switch would not have prevented the accident without the machine being turned off. The boy was injured because Barksdale failed to timely turn the machine off. To supply evidence of the element of cause in fact necessary to support the submission of the proximate cause Issue No. 6, the jury must indulge in drawing an inference on an inference.

The court in *Schlumberger Well Surveying Corporation v. Nortex Oil and Gas Corporation*, 435 S.W.2d 854 (Tex.1968) said:

[A]s has often been said by this court, a vital fact may not be established by piling inference upon inference, as would be required in this case. *Rounsaville v. Bullard*, 154 Tex. 260, 276 S.W. 791 (1955);

*Lobley v. Gilbert*, 149 Tex. 493, 236 S.W.2d 121 (1951). To permit proof in this fashion, would violate the rule of *Joske v. Irvine*, 91 Tex. 574, 44 S.W. 1059 (1898), which requires proof of any vital fact by evidence amounting to something more than a mere scintilla.

In the case at bar, the jury must infer that Barksdale would have turned the machine off had a switch been available. Additionally, the jury must infer that if the switch was conveniently located, Barksdale would have turned the machine off before the lapse of the "three seconds" from the time he removed his ice and "the child screamed."

I do not agree with the majority.